Case number 25-5243. Refugee and Immigrant Center for Education and Legal Services, et al, versus Kristi Noem, President of the U.S. Department of Homeland Security Interoperational Diversity, et al, Attendance. Mr. Ensign for the Attendance and Mr. Gellert for the Evaluation. Good morning, Mr. Ensign. Good morning. May it please the court, Drew Ensign, Deputy Assistant Attorney General for the United States. I'd like to reserve four minutes for rebuttal. The January 20th proclamation is a permissible exercise of the President's extensive powers under Section 1182F and 1185A. Through the proclamation, the President has imposed an entry bar at the southern border. Plaintiffs do not genuinely dispute the legality of the entry bar itself, but instead argue that they can nonetheless violate it with impunity. Essentially, that as long as they manage to enter the United States, notwithstanding the entry bar, they cannot be quickly repatriated and instead gain access to the asylum system as a direct result of their unlawful entry. Plaintiffs are mistaken. This Court's State Panel correctly concluded that the government is likely to prevail on its asylum arguments. That much flows inexorably from this Court's decision in Hueysha Hueysha, which recognized that because asylum was discretionary, the executive could preemptively deny asylum to those that violated a bar on the United States. As Judges Millett and Katz has recognized, quote, this Court held in Hueysha Hueysha that such a categorical and upfront rejection of asylum are permissible in emergency situations for a limited period of time, end quote. The State Panel further correctly recognized that proclamation, quote, suffices for the Attorney General and the Secretary of Homeland Security to categorically pre-deny asylum applications that would be futile, end quote. This Court should follow the path set by the State Panel and reverse on the asylum issue. Do you have a sense of what the regime, the regulatory regime looked like in the immediate aftermath, the month's aftermath after Hueysha Hueysha? And I guess to be more specific, Hueysha Hueysha said that the power to prohibit introduction included the power to remove. But it did say that withholding of removal rights endured as well as cat rights. And it was pretty silent, I think, about what the procedures needed to look like for the legal interests trying to vindicate their withholding of removal rights and cat rights. So do you have a sense of what procedures were used? In post-Hueysha Hueysha, so roughly in 2022, my understanding is that even before that decision, there was always some level of screening. It was less than expedited removal, but there was still some level of screening. The Title 42 orders, for example, had a humanitarian exception. And so there was a form of screening where questions are asked and, you know, you're essentially either directing those questions to answer the pertinent questions. And this course decision in Hueysha Hueysha made clear that the potential availability of statutory withholding or cats were questions that, you know, were pertinent and mandatory. And so that was part of the screening that was done. That was less than expedited removal, but it was part of the screening that was done. And essentially, that sort of direct repatriation system that followed Title 42 is strikingly similar to what was used after President Trump had this proclamation. And so this proclamation can be implemented in two ways, the direct repatriation, which is very similar to that Title 42 system, or expedited removal, but expedited removal as sort of modified by the proclamation, where, much like Hueysha Hueysha, the access to asylum is not available. Now, how do we reconcile the proclamation's ban on asylum with the rest of the INA? And I'm thinking particularly, you know, for the example, there's certain provisions that mandate a credible fear interview, and they also establish judicial review for those asylum decisions. Well, Your Honor, I think the reconciliation is much the same way that this Court reconciled them in Hueysha Hueysha, which is that this Court recognized that the discretionary nature of asylum was the way that could be reconciled. So this Court in Hueysha Hueysha said the best reconciliation of the two statutes is based on the discretionary nature of asylum. The executive may grant asylum, or it may not. It's a matter of executive discretion. But in Hueysha Hueysha, weren't you dealing with two conflicting statutes as opposed to a framework as we have here? No, Your Honor, I think much the same way you're presented with a strikingly similar situation. In Hueysha Hueysha, there was a statutory provision that created an introduction bar, and here you have a statutory provision that created an entry bar. And in many ways, our arguments are even stronger here. In Hueysha Hueysha, this Court acknowledged that Congress might have been clearer if it had used a word like entry rather than introduction when referring to the executive powers to prohibit individuals from coming here, end quote. But here at 1182-F, Congress actually did use the word entry instead of introduction. And so, you know, the result is even clearer here than it was in Hueysha Hueysha because whereas Congress used in this Court's view somewhat less clear language by saying introduction and thought Congress would have been even clearer if it had used the word entry, it didn't. I'm not sure that I'm following that because you started your argument by saying that nobody contests the legality of the entry bar. Well, that's because the entry bar doesn't add anything unlike the barricade or the in sale and unlike the Trump v. Hawaii where there was actually some additional foreclosure of entry. This is just parroting what's already in the law. It's not legal to cross the border between points of entry, right? Your Honor, I disagree with the premise for two reasons. I think as to Hueysha Hueysha, it was also the case that the vast majority of people arriving were already, could not lawfully enter the United States. Title VIII already barred their entry. And yet the Court recognized that the additional introduction ban, which could have been considered superfluous or redundant to existing Title VIII, nonetheless granted those additional powers. There was an additional entry ban that applied to people regardless of whether they were coming into a lawful point of entry, right? They couldn't come because they were coming from places where the government had deemed that COVID was spreading. That was an additional bar. And then you say, but here, this is an additional bar, but people can violate it with impunity. Well, they can't violate it with impunity. The INA already provides for removal and expedited removal. And so there's not impunity there, is there? Your Honor, we think there's impunity in the sense that the people are coming in order to make an asylum claim and they gain access to the asylum system by violating the entry bar and also committing an illegal entry. And so we think where that's your objective and you achieve it by violating the entry bar, that's the impunity in which I was referring. That was true before the proclamation as well as after, just to be clear, that you were not permitted, it was unlawful to enter the United States other than at a port of entry with the appropriate documents. That's true in the Hoysia Hoysia case where it was illegal for most of them to arrive at the United States between ports of entry. But that prohibition was not specific to people coming across the border between ports of entry. It was saying we don't want people who have infectious disease, right? Because they're going to spread the vectors of disease are going to penetrate into the communities and cause a public health emergency. That's correct, Your Honor, as to that particular case. But preventing disease is just one facet of the national interest of the United States. And 1182F recognizes broader interests that can be effectuated by an entry bar, whereas in Title 42 was a somewhat narrower effectuating the national interest solely with respect to public health. Nonetheless, it was an introduction bar and an entry bar. To make those effective, the principle is ultimately the same. Isn't the main difference, I mean, I think that you recognize this in your brief, the main difference between this case and Hoysia Hoysia is that this case is entirely governed by the INA and the INA provides for restrictions on entry and it also separately provides for removal and expedited removal. And the removal and expedited provisions deem themselves exclusive. And that would seem to imply, unlike in Hoysia Hoysia, where the court was confronting what did the public health law mean for this, that emergency here, the emergency is one that's contemplated by the INA. And the rather than allowing people to come across with impunity, they come across and they actually face removal provisions. Why is that not a distinction between this case and Hoysia Hoysia? For several reasons, Your Honor. I think, first of all, although the Title 42 order might have relied on a statutory provision in Title 42, it ultimately relied then on Section 1227, which is Title 8, to render people removable. You could say at that point, you were within the INA and you would be stuck with expedited removal or Section 240. And that was precisely the arguments the plaintiffs made in Hoysia Hoysia and they failed. And this court unanimously held otherwise that even though it was Title 8 that rendered them removable, the expedited removal and Section 240 was not necessary, that instead direct repatriation and an upfront categorical denial of asylum could be effectuated. I think a second important distinction is the context here. Whereas CDC is an agency, it has only those powers granted by Congress and nothing further. Here, the context is these are powers that are granted to the President, who has inherent Article 2 authority in order to expel aliens. It's a fundamental aspect of sovereignty. What the Supreme Court said in the Knopf case as to expelling aliens was, quote, the right to do so stems not alone from the legislative power, but is inherent in the executive power to control the foreign affairs of the nation, end quote. And so I think that context, to the extent these contexts are distinguishable, I think that's much more because Congress was legislating against a backdrop where the President has inherent Article 2 authority to expel aliens, and you could never say the same of the Surgeon General or the CDC director. But I want to go ahead, Judge Charles. I was going to say, it seems your entire argument is disconnected from the text of the INA. So I just want to address, let's go back to the text. If we're starting with the text of Sections 1182F and 1185A1, that's part of the INA and Part 2 is titled, Admission Qualifications for Aliens Travel Control of Citizens and Aliens. So how are we going to get around that title and then rule that these provisions give the President removal authority when that's addressed particularly in Part 4? Well, several reactions, Judge Charles. I think the first important one to note is within the text of the INA itself recognizes the discretion and nature of asylum. And that was the key aspect of the Hueysha-Hueysha decision. And so even, you know, even accepting the premises of the question, asylum remains discretionary. And as this Court recognized in Hueysha-Hueysha, the government can effectuate an upfront categorical denial to make an introduction or entry bar effective. I think the second point, the language- But don't you have the opportunity to actually apply for asylum and then it becomes discretionary on the back end? No, Your Honor. In Hueysha-Hueysha, this Court unanimously upheld the government's use of an upfront categorical denial that did not allow you to apply. It recognized that the back end denial would make that futile and that the INA did not require that futile gesture. But in Hueysha-Hueysha, the Court talked about the logic of the pandemic and recognized that the statute in, quote, normal times, the same would not be true, that you couldn't make this discretionary categorical upfront denial. Your Honor, I recognize there is some language to that effect. I don't think that's controlling here in multiple- What do you mean by in normal times unless it means when you're just dealing with the INA and not the public health provision in Title VIII? Well, certainly, I think normal times has a meaning within Title XLII. Within Title XLII, the Section 265 provision, that was referring to non-pandemic times. But so- But what if Hueysha-Hueysha didn't exist? I mean, what would be your best argument? Because I'm not sure I'm persuaded that that case supports the point as strongly as you're suggesting it does. Well, Your Honor, I think even if that case didn't exist, its logic and reasoning is recognizes that the executive has authority to exercise discretion whether or not to grant it, where they have determined that to effectuate an introduction bar in Hueysha-Hueysha or here an entry bar, a categorical ban is appropriate to effectuate it. This Court upheld it. So, admittedly, if Hueysha-Hueysha didn't exist, I couldn't point to that. I could only point to the logic expressed in that opinion that the discretionary nature of asylum permits that sort of upfront categorical denial. I think this Court, for example, generally requires exhaustion for an agency in order to present arguments to this Court but recognizes a futility exception. That's something that makes very solid sense where an outcome is certainly known. We don't require people or the government to go through empty steps in order to reach a result that is, you know, from the rules of law to govern. But I'm not sure that you ever answered the question when I asked you earlier about reconciling this with the INA that requires that credible fear interview and established judicial review for the asylum decision. So, Your Honor, I think that's only true in some context. So, judicial review is only available in Section 240 proceedings. It is not permitted under Section 235 expedited removal. As to expedited removal, there are three layers of review. You get an asylum officer, you get a supervisor. If you don't like the decision, you can get a de novo review by an immigration judge, but that's where it ends. With some limited exceptions, if you claim to be a citizen, for example, you can get habeas. But for the vast majority people, including essentially all asylum seekers, there is not judicial review under expedited removal. And furthermore, under direct repatriation, as was in the case of Title 42, there isn't the administrative review either. And, you know, this court did uphold that in Hawesha, Hawesha. And I think it's important to push back as well that the language they use to say the INA is exclusive, that language is limited to aliens that have been admitted into the United States, which is a term of art within immigration law of people that have, you know, been lawfully admitted to the United States. It doesn't even apply to people that have been lawfully paroled into the United States. And so for all or virtually all of the plaintiffs or aliens at issue here, they are not admitted aliens. And so that exclusive language would not specifically apply to them. You are relying on mutual asia to the extent that, I mean, I guess the question is there's a conflict in mutual asia between the Title 42 public health emergency provision and the INA, which confers a certain process for people seeking asylum. Here you don't have that kind of conflict because the provisions that you're relying on as setting up the conflict with the right to apply are also INA provisions. So Congress made the judgment in coming up with a comprehensive scheme that to the extent that a right to apply for asylum slows you down in removing people, that that's a decision that Congress made. So it seems like really the crux of the reasoning is this notion that we have these two different statutes and the public health emergency that the executive was responding to in mutual asia comes from a separate statute and the court really had to dovetail that statute and the INA. Here we have only the INA. And so to say there's a conflict is to say that you disagree with the way that Congress integrated these different provisions. Your Honor, I disagree with that, I think, for three reasons. First of all, in hoysia hoysia, Title 42 didn't say a single word about removing or repatriating people. Nothing. All of the power at issue that came to remove people in hoysia hoysia or under Title 42 came from Title 8. So to the extent that there was any conflicts, they were within Title 8. They were not exogenous to Title 42. Everything had to, ultimately everything had to be done under Title 8. The question was how broad did the Title 42 public health mandate carve? So it's, you know, how far into ordinary INA process use and rights did the Title 42 public health authority, you know, displace or deal with that punitive conflict? And you just don't have anything like that here. I understand your point about, you know, the thing that Title 42 public health authority was conflicting with was something and Title 8. But Title 8 doesn't conflict with itself is the other way of putting my question to you. And so how can you have that same dynamic? Your Honor, I think there's two additional dynamics. One is that by Section 1182F, Congress recognized that the president was given the authority to create or, quote, impose entry restrictions in addition to those elsewhere enumerated in the INA, end quote. And so that power to create additional entry restrictions and to make them effective is something that conflicts with those other provisions of the same bill. I thought you weren't relying on that before this Court, that argument. That the 1182F entry restrictions include encumbering an unlawful entry with a shearing away of rights that someone who reaches the United States would otherwise have. I thought you weren't making that argument. Your Honor, I think we have made that argument. Certainly, perhaps phrased somewhat differently, but we've always made the argument that direct repatriation is a way of making the entry bar effective. You know, I would say one of our key arguments is that, and this Court recognized a similar rationale in Hoysha Hoysha, that to make there an introduction bar, here an entry bar effective, it's not a toothless tiger. The government can take steps in order to make that bar effective. And that's an element of, you know, interpretation that Congress intends for statutes to actually be effective. But the President has authority to impose extra restrictions through regulation. Isn't that the notice and comment regulation? I don't believe so, Your Honor. I mean, the President is not an agency, and so the notice and comment rulemaking... Any agency would do that. Potentially, it could be subject to the APA, but as to what's promulgated by the President, it wouldn't be governed by the APA. So you're arguing under 1182F that when the President finds the entry of a class of aliens detrimental to the interests of the United States, he can suspend the entry of aliens of that class, right? C, E, G, Trump, Hawaii, or any class of aliens is rooted, or impose on the entry of aliens any restrictions he may deem to be appropriate. And that's the clause you're relying on. He can impose on the entry of aliens any restrictions he may deem to be appropriate. You're saying, well, the restrictions would be restrictions on ordinary asylum and removal procedures? Your Honor, I think we're relying on both aspects of it. And in part, it was much like Hoysia Hoysia, where in order to make a bar of introduction effective, the executive could take the steps of direct repatriation and cutting off access to asylum. Our argument is that under 1182F, some way the President to make a bar on entries effective can take those same measures. I don't read, and I didn't think you were relying on this before this Court, but I don't read 1182F to allow the President to add conditions or burdens on people whose entry has been suspended, but to suspend the entry of some. And if it is allowing the entry of others to impose conditions, for example, the documentation conditions that are also in the proclamation, but not before us, right? So it doesn't make sense to me to say that you're suspending the entry and then you're imposing on the entry additional conditions and that that could mean or authorize that people whose entry has been suspended and therefore are entering illegally somehow have additional conditions on them, like you can't apply for asylum. Is that your argument? Your Honor, it's one of our arguments. There's also an argument under the inherently discretionary nature of asylum. That's the other one I thought that you were really leaning on. The discretionary nature of asylum here, the President, or he delegates through the proclamation to the people who actually, by statute, can assert, make the discretionary decisions, and that they have made the categorical front discretionary decision. That's correct, Your Honor, that certainly within the asylum argument and that has been validated by Hoysha Hoysha. I don't believe the President's powers under 1182F and 1185A are limited such that he couldn't also take the steps necessary to make an entry bar effective, including defining consequences for violating it. But it certainly is the asylum issue, the inherently discretionary nature of asylum, its front and centers, is our argument. You don't read the proclamation to foreclose asylum to people already in the United States, because it's to people who came across the southern border unlawfully, not at a point of entry, and who are physically in the United States. The proclamation doesn't speak to foreclosing asylum to those people. I think it does, Your Honor. I think it specifically prohibits their invocations of any provisions of the INA that would allow them to remain in the United States. And then it specifically cites Section 1158 specifically. And so I think that does precisely that. I think that's actually far clearer than the policies at issue in Hoysha Hoysha. I also think there's also no dispute as to what the government's policy is here. There is a upfront denial of access to asylum for all of those that violate the proclamation. And the questions here are, you know, the legality of that bar. There's not a suggestion that, and certainly the district court didn't indulge in the APA claim as to whether or not that was written in the correct place. So that reference to restricting access to provisions of the INA that would permit continued presence is in Section 3, which is the section of the proclamation that talks about requiring medical information and criminal history documentation. But I don't see that language. Oh, no, it's also in 2 and not in 1. But I guess the confusion that I have is Section 2, for example, is only speaking to entry, restrictions on entry. And people don't have the right to seek asylum before they enter, do they? They cannot typically seek so from outside the United States. So who can actually apply for asylum under the proclamation? Or are you saying there's a proclamation in the entry bar, they cannot apply for asylum? For those that arrived at a port of entry and complied with its conditions, they potentially could apply for asylum. And then you mentioned 1182F and 1185, you know, with respect to removals. If we were to not agree with you there, are you still going under Article 2 as an independent basis for the President's Authority as to the proclamation? Your Honor, I think Article 2 is more important for in terms of construing the scope of the grant of Congress's authority, as well as it underscores, you know, the discretionary nature of asylum and is, again, supported by the fact that ultimately these decisions are the sort that fall within the context of the President's inherent Article 2 powers. You assume that the executive may make and has made an upfront categorical decision to deny asylum. What is your argument that that prevents non-citizens who are physically present in the United States from applying? The statute gives a right to apply even to people who are statutorily ineligible for asylum. So the futility argument seems to me Congress addressed and rejected. So what is the argument that that right seems like a pretty durable right that the last administration and that the first Trump administration recognized was a right that could not be swept aside by executive action, that now you're saying that it can be? Your Honor, I think it's just it's wishful wishing exactly what this court recognized that, you know, where because an asylum decision, quote, has already been made, unquote, allowing them to apply, it would be futile. And thus it could be validly cut off because the law essentially doesn't require the empty gesture of allowing people to file applications that are ultimately doomed to failure under the governing law and the standards that would be applied to them. And so we think that logic is ultimately controlling here. I have in my head three different kind of powers, and I've struggled a little bit with how much they overlap and how much they don't overlap. One is an 1182-F power to remove. The second is an 1182-F power not only to remove in a general sense, but to remove in a specific way that conflicts with 1225-B1 and 1229-A. The first is can you remove? The second is how do you is the substantive protections of withholding against removal and cap protections that regardless of the procedures that lead to them being vindicated, some people are going to want to try to vindicate if they can. So you can just scratch the third one off. I don't have a lot of questions about it. Those first two, again, a wish a wish, they kind of got bled together a little bit, I think. And here, I'm wondering, are we talking about the same thing? I know the government wants both, but what would it look like to give the government the first and not the second? Well, Your Honor, I think that's accurately describing the current system that's existed since this court's August order, where direct repatriation is subject to an injunction of the is currently essentially what is being applied at the southern border right now. And so, certainly, those two issues are distinct. And, you know, I think we are on the strongest ground, certainly, as to cutting off access to the asylum system. And, you know, certainly that's how the state panel, you know, kind of resolved those two questions. I think that in that second category of expedited removal, but expedited removal without access to asylum, the government has both all of its powers under 1182F, plus the additional inherent Article II authority, and then as well as the inherently discretionary nature of asylum. And so I think you have all of those for the government in that context of expedited removal, sort of as it's existed post August. As to direct repatriation, that is something that we think is also supported by Huesha Huesha. I mean, that this court thought was could be done to effectuate an introduction bar and implicitly recognize that language permitting an entry bar would be even better for the government. And that is what we have here. But certainly, we think we're on, you know, the strongest ground as to how essentially the state panel resolved this. Okay. That's helpful. Imagine the court were to resolve a few issues I'm about to go down in a certain way. I'm going to have some follow-up questions about what that would look like and some, I think, lingering questions after that. So imagine that the proclamation can bar asylum applications, as you say. And it includes the authority to bar entry includes a general authority to remove. But when it comes to how to remove 1225B and 1229A I still control in terms of the procedures that people resisting their removal are entitled to. And in those procedures, they can assert substantive rights that the proclamation did not have the authority to eliminate. And those two substantive rights are holding of removal rights and CAT rights. Also, there's no class injunction because of 1252F. But there is declaratory relief because of our precedent to make the road. And there is APA vacater with regard to, I guess, the guidance, but probably not the proclamation. Okay. So that seems to describe something pretty similar to what exists now and since August. And I guess, you know, there's a lot of parts of your brief that seem to say, you know, you really, really need to win all these issues or, you know, we're going to go back to 8 million people crossing the border illegally. I mean, it doesn't seem like that's going on since August. So I guess maybe this is a pretty open-ended question, but I have some specifics afterwards. What do you think that regime would look like that I just described? As you've described it, Your Honor, that is essentially what has prevailed since August. That does eliminate the government's ability to do direct repatriation, which I think was certainly very important in getting the crisis under control. Now we are in a somewhat different circumstance where the administration has successfully brought control of the southern border for the first time in a generation. And so that does, and I'll caution, much of this is not in the record because the post-August obviously is after the record closed, it's after final judgment. But, you know, the public data is that the number of encounters have stayed at historical lows. It is within the government's capacity to conduct expedited removal. Part of the reason the crisis became so bad in the Biden administration is the number of arriving aliens was so large that it exceeded the ability of the government to process them under expedited removal, and hence they had to be issued notices of appearance or paroled in. That is something that is no longer the case at present. I think the nature of that crisis also underscores why the President's authority. Go ahead. I mentioned 1252-F prohibiting a class injunction, as you argue. Unclear to me if that is covered by 1252-F. And the reason is, as the plaintiffs argue, that 1252-F covers, and now I'm quoting from your brief about the actual statute, it covers Chapter 4 of Title 2 of the INA. Cat, they think, is not part of the INA. Cat is part of FARA. So it seems like maybe 1252-F1 does not prohibit a class-wide injunction when it comes to that. Your Honor, I disagree with that, but I think there's two different contexts, and so the arguments for why it applies in each context is different. As to direct repatriation, the cat regs wouldn't apply by their terms. They only apply to Section 235 and 240 removals. There is cat screening within direct repatriation, but the plaintiffs argue that it violates the reg, but the reg doesn't apply to direct repatriation. So there isn't a 1252-F issue there. There's just a merits issue. As to how it operates within expedited removal, then you are squarely within 1252-F1 because that is effectively seeking to enjoin how expedited removal is being operated. If you disagree with how cat screening is being conducted within expedited removal, that's exactly the sort of injunction that requires the operation of expedited removal in a different manner than the government's operating it, and so that's squarely within. I'll think on that. That's helpful. Do we need to decide the size of the class if 1252-F1 prohibits a class-wide injunction? I don't believe so, Your Honor, in that the—I haven't specifically given that thought, but my intuition is that if 1252-F is barring relief to non-class members, then the size of the class may not be a particular— Barring injunctive relief, but there's a chance it would still allow for declaratory relief, and also there's the APA. I take it the APA doesn't need a class because one person can sue the vacate regulation, but on the declaratory relief issue, if he looms on that, if we conclude that Make the Road allows class-wide declaratory relief, then would we still—then would that mean we do need to address the size of the class? Your Honor, I'm not sure offhand because the nature of declaratory relief is such that I'm not sure that it terribly matters who specifically it applies to. I do think that if it were conferring any rights that could be exercised by class members, then you would be squarely presumptive of the transunion issue because then it becomes an issue of the authority of the courts to issue that relief, and in that context, transunion makes quite clear that you cannot issue—that class cannot be any broader than people—that every single one of them possesses Article 3 standing. Again, I'm coming to an end here. I appreciate your patience and my colleagues' patience. There are individual plaintiffs who the state order did not—the state order did not provide relief to the government with regard to the individual plaintiffs, you think. Do I have that basically right? I believe that's correct, Your Honor. It took effect immediately, and the district court kind of severed its two things. In other words, the district court's injunction survived the stay panel unscathed with regard to the individual plaintiffs. I believe that's correct, Your Honor. I'm not even sure that we sought relief as to this day on that. I don't know if they received complete relief. Are they still in removal proceedings, or what's the status there? Your Honor, I think it's a mixed bag. I'm not sure offhand. I think they were in different categories. Perhaps the opposing counsel could speak to that, but I don't know the precise status of the plaintiffs. And even if they had received complete relief, the case would not be moot in any event because of the possibility of association standing. Is that correct? I think it wouldn't be moot, certainly, because even if they had received complete relief, this court could undo it, and the possibility that it could do so would be provide a form of effective relief that would preclude the mootness inquiry. Okay. Thanks a lot for your answers. If I may, one quick housekeeping matter as well. To the extent that this court is inclined to dissolve any aspect of its stay that is currently in effect, we would ask that the court delay the effective date by 14 days. The enormities and complexities of border management are such that can be kind of turned on and off like a light switch. So we ask the district court to delay it for 14 days in order to seek an orderly stay. In that instance, the district court granted that request. We would make a similar request to this court to the extent that it would vacate any aspect of its stay. Of course, our request is that you reverse the district court's judgment in its entirety. All right. We'll hear now from Mr. Gallant. Good morning, Your Honors. May it please the court, Lee Gallant from the ACLU for Plaintiffs. I'd like to, if I could, just jump into the conversation that Judge Child was having with my friend about the INA and reconciling the INA. I think that's the whole case here, really. It's that this is an eternally coherent statute, which Congress has put together the pieces. And what's ultimately happening here is that the administration doesn't like the way Congress has put together the pieces, but Congress has put together the pieces. And so if I could, I'd like to put a pin in Hoosier, Hoosier for the moment and come back to that, but explain why the proclamation is not permitted to bar asylum. Because I think that's where sort of all the about asylum, or at least to start with that. So the government has toggled back and forth throughout the litigation between two theories. The first theory is that 212F itself allows the government to override asylum. They've now in this court, as Judge Pillard has pointed out, sort of switched gears a little bit and said, well, it's not that, it's more the nature of asylum being discretionary. So, but let me, let me talk about both of them. 212F cannot override asylum for many reasons. 212F speaks to the ability of the president to bar entry. And indeed, executive branch has consistently taken the position for four decades back to Ted Olson's opinion for OLC saying 212F doesn't override asylum. And indeed where Congress wanted to say in an admissibility ground, meaning a ground in which people can't enter the country can override asylum, they expressly said so. So they expressly said in the asylum statute that one of the admissibility grounds dealing with terrorism, which makes sense would override asylum, but 212F itself cannot override asylum. That's never been the executive branch's position. In fact, just last year in 2024, they put out a regulation and a long federal register discussion saying 212F cannot override asylum. So I think this court ought to be very wary about finding that power in 212F against the consistent position of the executive branch where Congress has chosen to reconcile the statutes. And indeed, as Charles pointed out, the asylum statute is very clear. It says you may apply if you're in the country, irrespective of your status. So it doesn't matter how you came, what your status is. It says whether or not at a port of entry. And so understandably, I think that's why the government has abandoned this notion that 212F itself can override asylum. And so what they've switched to is, well, the discretionary nature of asylum allows the president to override all of asylum and not allow you to apply at all. And so the first point I want to there, it's just to this point about discretion at the back end being in individual cases, it's almost never that case that someone's denied asylum on discretionary grounds, only where there's something extreme and there very much is review. And if you look at 8 U.S.C. 1252A2B2, it actually exempts asylum from a bar on review of otherwise discretionary claims. But I think the more fundamental point is that the discretionary nature of asylum does not allow the president to enact this categorical bar. And the reason is threefold. One is 1158 is explicit that if you want to add a new bar, it has to be by the agency, either the attorney general or the secretary of DHS. The second point is it says it has to be done by regulation. And that's no small thing because eliminating asylum is an enormous step. And so at least when there's a regulation, it's subject to arbitrary and capricious review, people can weigh in. The third reason is the most fundamental. The statute 1158 expressly states that any new bar, even if added by the agency and even if by regulation, must be consistent with the asylum statute. And Judge Bybee in his East Bay case goes through this very clearly. And what that means is you can't have a bar that essentially wipes away everything that Congress has done. So a categorical bar by an agency by regulation saying murderers can't get asylum might be consistent with the asylum statute. But a bar like the one the president has enacted, even assuming the president can do it without regulations, is plainly not consistent with 1158 because what the proclamation says is you cannot get asylum if you've entered illegally or without documents. But the statute, as I said, expressly states you are entitled to apply for asylum irrespective of your status and whether or not you entered at a port as long as you're physically on U.S. soil or arriving at U.S. soil. So there's- Could the executive lawfully accomplish the same end results and objectives of the proclamation by promulgating regulations or would that even be unlawful? That's a very good question. And even that would be unlawful. You're absolutely right. It would first have to start with a regulation by the AG or secretary of DHS. But then for that third reason I mentioned, it would still be unlawful because it would be inconsistent with 1158. It would effectively wipe away the statute. So Congress made a very, very considered decision to say, we are going to allow you to apply for asylum if you get to U.S. soil regardless of how you get here. And the statute expressly says whether or not at a port of entry and quote-unquote irrespective of your status, we are going to allow you to apply for asylum even if you've entered illegally. And the reason is because Congress understood, consistent with international law, that people fleeing do not always have their papers, cannot always come lawfully, cannot always find a port of entry, cannot sit in their home country to wait to get papers. And so they get here any way they can. And that's why Congress could not have been clear in 1158. So that's why, and the statute moreover, as I said, says any new regulation, even passed by the, enacted by the agency through regulation, must be quote-unquote consistent with this section. And so a proclamation, or in your case, to your hypothetical, a regulation that says asylum is not available simply because you came here illegally or without papers would be absolutely inconsistent. And I would recommend to the court, Judge Bybee's decision in the East Bay decision, where he goes through all this. And in fact, the regulation that he struck down, to your point, Judge Childs, about whether it would be consistent if it was done by regulation, he had an even harder regulation before him that he struck down because that went to eligibility, not the ability to apply. And the government said, well, we're still letting you apply. We're just going to deny you eligibility. And he said, well, that's a false distinction. But here, they've even skipped that step and said, we're outright not going to let you apply, even though 1158 specifically says you may apply. And there, they cut off asylum only for people between ports. This is broad-based, to your point again, Judge Childs, about who does this affect. It affects everyone who's coming. And a lot of people say to me, well, what about if you come to a port of entry, and it's clear you're going to be discriminated or persecuted on the basis of your religion or something like that, and you have overwhelming evidence. Nope, the proclamation doesn't even allow that. So this is- Well, if individuals are still allowed to apply, would it be your position that the government could then lawfully use its statutory discretion to deny every single asylum application? No, absolutely not. I mean, so first of all, you're right to point out that application and eligibility are in different parts of 1158, the asylum statute. This says you can't apply. So right there, it expressly violates the terms of the statute. But if they were to say, well, we'll let you apply, but then deny it anyway, that would be exactly what Judge Bybee talked about. That is basically wiping away the statute to just play games. That's formalism. I mean, that's sort of a formalist over a substance kind of distinction. So absolutely not. The point of the statute is people are in danger. I mean, we have people who are fleeing Egypt, Turkey, the Taliban. The point is to at least allow them to apply and have their application considered. There's no question based on the Board of Immigration Appeals decision in matter of HULA as Judge Bybee discusses. At the very end, as you pointed out, Judge Childs, there could be some discretionary element. But what's absolutely notable about the matter of HULA decision in the BIA is it said the mere fact that you came here illegally can't be dispositive even at that back end on discretion, even in an individual case, because that would make a mockery of the statute that says you're entitled to apply for asylum and be considered for asylum irrespective of your status and regardless of how you came. So I don't think that this bar can stand regardless of which theory the government's ultimately relying on now, whether it's that 212F overrides or that the discretionary nature of asylum is sufficient. And so if I could, I want to turn to Hawisha. I, Judge Walker was obviously the author of that opinion. I argued we had a long back and forth about that during Hawisha Hawisha. I think there's many differences in Hawisha Hawisha. The primary one is, of course, what Judge Pillard and which Judge Childs pointed out is there you were expressly reconciling two different statutes and made a significant point about how the best reconciliation at that point. And as you said, it was a tentative decision. For that reason alone, I would counsel that it's appropriate not to expand Hawisha Hawisha. We're reconciling a statute outside the INA with the INA that had different language in different circumstances. Indeed, as Judge Pillard pointed out, was sort of discussed as in normal times, things might be different. And notably, I don't know if Judge Walker remembers this. I'm sure not. But the government said to Judge Walker in its briefs in Hawisha Hawisha, our interpretation of 265 is irrelevant to how you interpret 212F. And indeed, that's because I think consistent with their position over four decades, they had said 212F doesn't override asylum. So we see no basis for Hawisha to control this case. And certainly given the tentative nature of Hawisha Hawisha, I would leave to the panel whether Hawisha Hawisha is technically binding. It certainly was expressly tentative. The other point I just wanted to make is what my friend said when he first stood up, which I think Judge Pillard has already addressed, is that this is not about letting people get on U.S. soil and then giving them impunity. Our position, just to be very clear, is you get on U.S. soil, you can still be removed. You're still inadmissible. Just like any of the other inadmissibility grounds in Section 1182, the 1182A, 1 through 10, all those grounds are saying you can't come in. If you get into the U.S., all those grounds allow you to be removed. The same thing with the 212F proclamation. We're not saying you get onto U.S. soil and you have impunity, you can't be removed. We're simply saying, and I think Judge Walker was asking my friend about this, that you have to use the procedures in the INA that's in Section 240 and the ER procedures, and you have to provide the substantive protections that Congress has provided. And I want to correct one thing that my friend said. He said that 1229A only goes to half of whether it's inadmissibility and deportability. 1229A expressly allows you, expressly applies to anybody who's either deemed inadmissible, which these people would be, or are deportable. So that's the statute Congress wrote and prefaced it with. This is the sole and process for removing people, but for something that's specified in the INA, which is the expedited removal statute. Do you agree with Mr. Einstein's description of the kind of practical effects of leisure leisure in terms of what facts looked like on the ground for them? Yeah. So we did try and get to the bottom of exactly how it was interpreted. I mean, as you already know, it was ultimately Judge Sullivan vacated it on different grounds and it ultimately went away. But at the time, it basically allowed the government to push people back to Mexico. They were supposed to give them a screening for withholding or CAT. Those screenings did not generally occur because they used what was called the manifestation standard, which I do want to touch on briefly if I have time at the end, which basically said people need to know to say they're in danger and ask for a screening. But basically, I think I agree to the extent I understood what he was saying is they could still remove people without any process, but if the person asked for a fear screening, they would get a screening for withholding or convention against torture, but they had to know to ask for that. And otherwise they would be repatriated without any process. And that looks pretty similar to how things have looked since August, right? Well, I think the difference is that the state panel made it clear that the removal process does have to be used either 240 or ER. I think, you know, you're right. You know, Oisha, Oisha, you didn't spell out what process had to be used. You did point out that expulsion can happen under Title 42. And the reason I think you had to point that out, which you don't have to hear, is that we argued very strenuously that once 260, once you got out to U.S. soil, Title 40 didn't apply any longer. And so I think that's what the discussion you had in Oisha, Oisha was designed to hear. We're not saying 1182F doesn't apply once you get on U.S. soil. You just need to use those processes. And 1182F, of course, comes with companion provisions for removal where you were trying to reconcile a statute, a unique statute, from way outside the INA. So would it be fair to say that in the months after Oisha, Oisha, before the district court vacated, would have vacated, the facts on the ground were not as good as you thought they were going to be? I think they were bad for us. I think people were being removed without any screenings whatsoever and were put in real danger. And I do want to, to your point, I don't know if you had a follow-up, but I just wanted to make one quick point for the whole panel here. The government is obviously saying even withholding it cannot be used. They reply only cap and only if you know to say I might be tortured. The reason we're making such a big deal about asylum is that largely the whole ball game now is asylum. So withholding gives you protection against persecution, but it's a very high bar to me. But the critical aspect of withholding is that it only stops you from being removed to your home country. You can still be removed to a third country. What's happening now under this administration is they're saying, okay, we can't remove you to your home country. Maybe that's Columbia. We're going to send you to West Africa, or we're going to send you to Asia. We're going to send you somewhere where you have no connection whatsoever. Asylum on the other hand, what the Congress was very explicit, asylum does not allow you to be removed. It allows you to get your family and potentially if they're eligible and it allows you ultimately to apply for permanent residence. Without asylum, I fear that even if people are given withholding, they're going to be sent to far-flung places all over the world. So for us, that's why asylum is so essential beyond even any protections that withholding of removal or the Convention Against Torture would give. Can I ask you some questions to go to remedy? Yeah. The APA backer would cover the guidance, not the proclamation. Is that correct? Correct. Okay. And you don't really need a class to vacate the guidance? No, we don't. What about for declaratory relief? Is there a point to that being a class or could you not need the class for that as well? I think a class would be important there. Otherwise, I think people would have to come in and bring individual cases to assert their rights. I think that's going to be very difficult in a situation like this with people at border. Class is pretty broad and there's some debate in the briefs about whether you and the government are even disagreeing about whether we should change the class as it existed after the state panels. But I think the government would say that after the state panel, the class still covers people who are not here today but will be here tomorrow. And they don't want that. And I think you're saying you agree that that's what the class as it exists post state panel coverage. Is that right? It would cover someone who once they get to U.S. so they become a member of the class. And I think that for us is critical. It's a little difficult and that's what the state panel data. You're right to clarify tonight. It's a little difficult to understand whether the government opposes that. But I think they do oppose that. I mean, I could see why I think that means someone who when the final judgment is final is, you know, imagine someone in an Amazon jungle who had no contact with anyone outside their tribe. I mean, the district court has issued a class wide injunction that covers someone that far removed from people with actual imminent injuries. Well, I think it's not that different than a normal class that has future members. So your honor is positing someone who may never come here. So then they're never going to get the protections. And obviously, if years from now, the government wants to go back and say the injunction has been in place too long. If that person did tomorrow, learn about the United States and come here, that person would be protected by the class wide injunction. Well, they would. And I don't know if your honor is positing a situation where the only reason they're coming is because of the. That person is so unlikely to be injured that they can't possibly have standing. And yet I think they would. Yeah, I'm sorry to interrupt. I think they would have standing once they got here. And I think that's no different than any kind of class that has future members. So if they never decide to come, no harm, no foul. If they come. They're not actually part of the class because they're not part of the class unless.  They come, they have it. But for the proclamation and guidance, they would have an intention and a basic asylum withholding protection. So it's not people in the world who will never come or aren't being persecuted. But there is this problem with whether in TransUnion saying you have to have a current. Imminent harm, you can't be in the class. And I think you're right that in many injunctions in the past, they've had this nature of when you come and you develop standing, then you are in the class. But I think Judge Walker can follow up, but I assume he's asking about, you know, more recent law that suggests maybe you can't. Yeah, I think the law is still down. We don't understand costs to change this, that you can have future members. Now, I think Judge Moss on remand could decide whether someone who doesn't get here for years. But the problem for Judge Moss, I think, is you have someone who's in real danger. They're going to come two days after the decision, assuming you uphold the decision. They have to be a member of the class once they get on U.S. soil. And so, you know, I do understand and it's fair, Your Honor, is asking about someone who's in the Amazon who may never come or could come five years from now. But I think Judge Moss on remand could handle that. But it can't be that no one who is not on U.S. soil right now would not be part of the class. And indeed, you know, we have people who are on U.S. soil who were removed. Judge Moss put a pin in that for another time. But it can't be, I think, that we have to come to court each time someone comes to the U.S. I mean, that would be unworkable, I think. I think, well, go ahead. I was going to move on. So, please. Well, what the government says is a court may not certify a class that would sweep in uninjured, absent class members, people who are yet to be perceptibly harmed. And then quotes TransUnion, Article 3 does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. So, I think the question is whether the government is reading that to say you can't include them in a class. Right. Because that would be ordering relief. And maybe is your answer that, well, they wouldn't be ordered relief because. Well, that's exactly right. They're not entitled to anything until they become part of the class. And they don't become part of the class until they step on U.S. soil. And those were in that situation, they were, it was about relief, not about class membership, but they were, you know, half the plaintiffs were people whose information had been made public and others where it was just erroneous, but in the files of the credit bureaus. So. You had other questions. The government said a few minutes ago that HAT should be considered in Chapter 4, Title 2 of the IAA for 1252F purposes, because it's part of what would be required in the removal proceedings that are required in Chapter 4, Title 2 of the IAA. Do you have a response to that? Yeah, I think that proves too much. I mean, if that's their position, then presumably asylum would also be, and they haven't made that argument with respect to asylum. But I just, taking a step back about 1252F1, I think the government's argument ultimately proves too much. The government, Judge Moss essentially said 1252F, proclamation is ultra-virus from 1252F. 1252, I mean, sorry, 212F does not authorize the proclamation. So there's an ultra-virus problem. The government's now saying, because we can't use 212F, we're now left with the INA, and therefore you're essentially telling us to use the INA. That can't be right. That would essentially make 1252F1 limitless. The president could say, I refuse to use any part of the INA. If this court said, well, you have to, you know, you can't just say, I'm going to remove people, I'm not even pointing to a statute. The government could say, well, now we're forced to use the INA. I follow. I thought their part of the briefing was well done and your part of the briefing was well done on that issue. I think I understand the arguments there. I'm not sure I fully followed your approach too much with regard to CAT specifically, because you said, well, that would mean asylum is covered, but asylum is covered by 1252F. Well, asylum is outside of chapter four as well. That's the only reason I was making that point. It's the government saying, because CAT is outside of chapter four as well. And so the government's never suggested, and it couldn't possibly suggest that asylum falls under 1252F1. And I don't want to be suggesting that both asylum and CAT shouldn't fall into 1252F1. I just think neither does. I think there's the more fundamental problem that we are challenging 212F, and that's obviously out of chapter four. I would urge the court, if it's interested to look at the government's application in the DVD case, which Judge Moss cited, which explains their real position on 1252F1. The government said something in their brief along the lines of, you've not identified any statutory provisions of the INA or statute implementing CAT that contradicts the procedures set forth in the guidance with regard to CAT. I'm sure you disagree. Maybe you can rephrase it a little differently. Well, I think the regs were passed pursuant to CAT. Those regs have never been challenged. They're lawful. And I think what the regs do are two things that I mentioned, which are very important. And I would note that the government is not following the state panel on this and not applying the regs. The regs require that there be a significant possibility standard at the removal stage, at the credible fear interview stage, not the ultimate high burden of more likely than not. And that's the 208 reg. I think it's 208.30, because you can't be expected to meet your ultimate burden at the border without any help. And the other reg, which is critical, is in 235. I think it's 235.50, which says you have to advise people of their rights and specifically ask them whether they have fear. And so those are the two regs. They've both been passed pursuant to the statute, one pursuant to the expiry removal statute, one pursuant to the asylum statute. And so I think that Judge Most was absolutely right to say 212F can't wipe that away. So those are the regulations, but there's not a statutory provision that the summary removal procedures conflict with if there's two regulations? That manifestation said, well, there's a significant possibility statute that applies to asylum. It doesn't apply to withholding a cat. But those two regs have been in existence for a long time. The government's practice has always been you have one credible fear interview, the significant possibility a standard is applied to asylum withholding a cat pursuant to that regulation. And the government's consistent practice has been that you advise people with a form 867 that Judge Most laid out saying, do you have a fear? Would you like to have a screening for that? So I think your answers to me and to Judge Pillard's last question confirmed that the government sentence is correct. It doesn't necessarily mean they win because their sentence is not talking about any regulations. Their sentence, I don't have the exact sentence probably, but something along the lines of no statutory provisions of the IA, no statute implementing cat contradicts the procedure set forth in the cat guidance. Right. On the point about manifestation and the significant possibility, those are not statutory. Those are regulatory, but they are longstanding pursuant to, I know I'm just repeating myself, pursuant to those statutes. But I thought you just said there is a significant possibility. There is for asylum. For asylum in the statute. Yes, in the statute. I'm sorry. I apologize. I thought Judge Walker was specifically asking about cat. I was, but you have to get it all covered. Okay. Yeah. Mr. Ensign was, I just lost it, but was talking about protection that was only applied to people admitted into the United States, not people paroled. And I lost track of what that was. I think he was raising the entry fiction doctrine. The entry fiction doctrine is a constitutional doctrine for purposes of due process. Whether someone stopped at the border and paroled in is entitled to the same due process rights as someone who's been admitted or maybe here lawfully for a long time. And I think Judge Walker cited that doctrine in Hoatia. That doctrine has no relevance to the statutory claims we're making here. We're not making a due process point. We are making only a statutory claim. And I think Judge Walker and Hoatia rightly distinguished the entry fiction doctrine as a constitutional claims with what statutory rights Congress may give you. 1231H put aside the forfeiture issue. Yeah. I think I follow their argument. What's your argument response? Our argument is that it simply doesn't give you an independent cause of action under withholding, but it doesn't mean that you can never challenge the withholding restriction based on the sources of law outside that of withholding. So in our case, obviously, that you can't wipe it away with 212F. And that's the fight is talks about that. The government rarely cites that provision when it has been rejected. But it's what's the source of law that plaintiffs are relying on to challenge withholding? Would it be that APA and the guidance is is right? Well, that withholding is there unless it's taken away. Government has tried to take it away using 212F. 212F doesn't allow you to override withholding. And I think that follows from that does follow from how we show we should obviously. It's like you're it's like you can't vindicate a 1231 right that you can vindicate an 1182F right. 1182F is not what the president can do, not what you're entitled to. Yeah, I think we read H and again, I don't know any court that's ever accepted the H argument when the government sporadically makes and I think Zadvidas deals with it pretty firmly. The Supreme Court's decision in Zadvidas that it just doesn't give you independent rights beyond what withholding does or allow you to have an independent cause of action and go into court and say, I want withholding. And here are my rights, the sort of the classic independent cause of action. But you obviously can go in and say, I want withholding. And this this is it's been unlawfully taken away. So the argument about ex ante categorical exercise of discretion, which seems to me really the core of their position to the extent that they are not really relying on 1182F, they're looking at Wisha Wisha, they're saying emergency there, emergency here. Yes, the INA is a fully integrated statute and has removal and has expedited removal, but didn't contemplate the level of dysfunction, the level of flooding of the border that we have. And so if ex ante categorical exercise of discretion was available there, it's available here. And if it is available, then the right, you know, no matter what, apply for asylum also is futilized people in a different way from in the other situations where even to know whether someone was disqualified from asylum, you'd have to look at an application to know whether they're in that group or not. I think the government's argument would be, well, this is different. This is more like Wisha Wisha, where it's just everybody, anybody there, they're wanting to ex ante and exercise of discretion, prevent from coming and therefore sort of running the by the logic, the other direction and say, you know, we're not going to give you a right to apply because we're not going to give you the asylum just so it went by me says like, oh, you have a right to apply. Well, if you're not ever going to get the asylum, you know, the two should travel together here. I think the government is saying they travel together. And the answer is no. What's your best answer to that? Yeah, I think a few things. One is I want to just put a pin in a way of time to come back to the question of there's this crisis here and the proclamation has solved it. Well, let me just just address it really quickly. But I don't want to fight on that ground because nothing in our argument hinges on whether the president has correctly said this is a crisis and or not. But I would recommend the Cato brief, the amicus brief written by Cato that points out that by the time the proclamation was actually passed, the migration flow had been reduced by 90 percent from the highs during the administration. And also, I think the fundamental answer is, of course, this just illustrates that the president doesn't like what's going on, like what the scheme that Congress has created. So the answer is to go to Congress. But to your more precise question, I think the answer is, is, you know, I don't want to sort of beat a dead horse, but is back to 212 that and override Assad, that this is a coherent statute that Congress didn't anticipate that 212F would do anything more than allow the president to bar entry. And you look at Hawaii v Trump, that's what it's about. It's about barring entry, creating new invisibility grounds. And indeed, the government has used 212F 90 times in the past, along with OLC memos. It is never suggested. In fact, it's concluded the opposite, that it can override asylum. Now, to the discretionary point, I think that ultimately comes down to Congress having directly addressed it and different ways. And to your point that this is an internally coherent statute. So the proclamation talk is based on the criteria as you came illegally, you came without papers. But Congress anticipated that was expressed that it doesn't matter your status. They know people are going to have to flee in danger and get here. It doesn't matter where you enter. They know people can't always get to a port of entry. They won't have papers. So they expressly address that. And then they said, you can add bars, but they have to be consistent with the statute. And I think Judge Bybee's point was, if your bar says you're not going to be allowed to apply for asylum or ultimately obtain asylum because you came here illegally or without papers, you're wiping away the statute. But the statute says that the bar has to be consistent. I would also just go back to my other points about the president can't do this. The statute, again, was explicit. It has to be by regulation, by the agency. And I think that's for good reason. Wiping away asylum is such an enormous step. I mean, we made a solemn promise after World War II, we would never again send people back to danger without at least a screening. So Congress has said, if you want to try and enact an upfront bar, it has to be by the agency. And it must go through notice. It must be a regulation that allows people to push back. But again, ultimately, the fundamental difference is, you can have a bar by the agency, if it's consistent with the statute. The example I gave before, you're going to say no murderers can get asylum. But you cannot do something that's directly inconsistent with the initial words in the asylum statute. Everyone may apply, irrespective of status and whether or not they entered out of court. You're not challenging the provisions that you have to bring. If you come to a port of entry, you also have to have documentation of your criminal history and your health. We are, Your Honor. Well, I think it is. I think that Judge Moss struck down the proclamation. I think it's part of it. And I think the reason that's unlawful is because that also sort of not sort of is inconsistent with the asylum statute. Because Congress did not require people to bring papers with them. That's why 212 is ultimately about stopping entry. And particularly, people with visas have already done their paperwork overseas. They expected asylum seekers to show up maybe with just the clothes on their back, no papers. So requiring them to bring papers would be inconsistent with the statute. The very thing Congress was trying to do is say, you're not, you're here unlawfully, and we can remove you if you don't ultimately get asylum. But you're going to be screened for asylum because you made it to USI and you're claiming you're in fear. And then turning over your answer on the need for a class in order to vindicate the declaratory relief. I think what you said is absent the class, then each individual person would have to sue to vindicate that declaratory judgment. But that really, really makes it sound like an injunction. And I think you needed to not be the exact same thing as an injunction, or else it's covered by 1252F. Well, so I think a couple of points, and those are fair questions. One is if the vacator stands, that makes the injunction less important. The reason the injunction is important, I just want to make this clear. Any declaratory? Yeah, I just meant more relief than the vacator. I'm sorry, I misspoke. The vacator should have been enough, but the government said to Judge Moss, even if you vacate the guidance and the agencies don't know what they're doing, we're going to enforce the proclamations. So Judge Moss said, well, then I need to issue the injunction. On declaratory relief, I think this court has already said and made the road, you can have declaratory relief in a class. So what I'm saying is that you can have individual injunctions. If there's a declaratory class-wide relief, then each individual can then use that to come into court and say, well, I was part of this class. And 1252F1 doesn't speak to an individual coming in for an injunction. There was an individual plaintiff who obtained declaratory relief, and then other people came into court later and said, give me an individual injunction based on that declaratory. That's a fair question, and we're happy to brief that. I'm not sure as a practical matter how different it would be, but I think it would be different in coming in and saying, I was part of this class. It may require an entire new case and to brief everything from scratch. So I don't know whether as a practical matter, and I apologize that I may not have given it enough thought to know exactly the practical, but I think we would stand by the need for a class-wide declaratory. We don't think that Judge Moss abused his discretion in doing that in light of Make the Road. All right. Thank you, Your Honors. If I may, just four quick points. First, all the arguments that plaintiffs have made about the supposedly non-discretionary nature of the right to apply for asylum are arguments that could have been and were made to this court in Hoysia Hoysia, and this court unanimously rejected them. We think that same result needs to obtain here, and nothing has changed in the interim. Second, plaintiff's arguments would leave the government powerless to address future border crises. Judge Childs, you asked what the government could do to address this, and I think plaintiff's answer was fairly dangerous invitation to return to the crisis that pervaded the southern border just one short year ago. Third, as to the class, I still have yet to hear any argument how this class definition is consistent with the Supreme Court's decision in TransUnion, a case that their brief strikingly does not address, and indeed they seem to admit that the class could include people that may never come here. Such people do not have the sufficiently imminent injury to satisfy Article Three. They therefore do not have standing under TransUnion. They hence cannot be part of the class. That's not really what TransUnion said. It talked about who could get relief, and nobody would be getting relief unless and until they were seeking. They were at the border, coming into the border, seeking asylum subject to the proclamation and the guidance. So I think that it's a different situation. TransUnion was talking about people who might never be in a situation to need the relief, but it actually captures people who are, and once they are, in a position to actually need the relief. Well, I think two responses to that, Your Honor. First of all, what the Supreme Court said in TransUnion, I think, is broader than that. It says Article Three does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. Yeah. So I think that... Order relief. Well... Not to include them in a class that might be eligible for relief if they actually stepped up into the situation of the class definition. Well, beyond that, Your Honor, this is a B-2 class. The remedy has to be indivisible. And so they are getting the same relief as everybody if that relief is... So that is a formal matter. That relief is being provided to them, even though they don't have Article Three standing. That's the fundamental nature of B-2. And to the extent that the court might think the situation is different, that just means that a B-2 class shouldn't have been certified at all. And you had another, a fourth argument. Yes, Your Honor. Certainly, as to 1252 F-1, we do believe that it certainly applies to asylum insofar as it applies to asylum in the expedited removal process. Expedited removal is absolutely one of the provisions that is covered under Section 1252 F-1. And so to the extent that plaintiffs are arguing that the inability to get asylum and expedited removal is something that should be enjoined, which is something that the district court did do, that is squarely governed by 1252 F-1 and the Supreme Court's decision and all among Gonzales. I can see where Misha Weisha is arguably a binding precedent in a case that's in the same procedural posture. It was an appeal of a preliminary injunction. This is an appeal of a preliminary injunction. So I'm not sure that you tell me, and you represent the government, this will help you sometimes and hurt you sometimes. Is Weisha Weisha controlling precedent when the posture is an appeal of a permanent injunction? I believe so, Your Honor, with the caveat that it's a published decision of this court. So to the extent that it resolves any questions of law, it's binding precedent of this court that would ordinarily be binding subject to various procedures like en banc or irons or intervening decisions. I feel like that resolves whether a party is likely to succeed on the merits, but it doesn't actually resolve the legal question of whether the party is correct on the merits. So I think that's the important caveat. So it is a published decision, so it's binding to the extent that the panel laid out a definitive position of law. And so to the extent that the panel... And would it be dicta if they laid out a definitive position of the law unnecessarily when they only had to reach whether there was a likelihood of success in the law? I don't believe so, Your Honor. And as a practical matter, courts of appeals do it all the time. Certainly many preliminary injunction appeals have questions of law. Those could be answered tentatively or definitively, and circuit courts routinely do the latter. We think there are many issues. And so there are certainly caveats and hoysia-hoysia, but there's also language that certainly appears to be the more sort of binding holding of law rather than a simple predictive judgment as to what party is likely to prevail, which makes sense consistent with it's a pure question of law. It's going to come back to you in the exact same posture as a final judgment as it would as a preliminary injunction. But I guess even broader than that is even to the extent that you don't think it's formally binding precedent, we think it's just plainly correct as a matter of law and logic, and we would urge this court to follow it. I agree with that. All right. Thank you. The case is submitted.
judges: Pillard; Walker; Childs